53    545
55    499

JEFFERSON AND ANOTHER V. EDRINGTON AND ANOTHER.

Decided July 5, 1890.

1.  *Confusion—Trust funds.*

Where, in the purchase of property, a trustee has mingled trust with in-
dividual funds, the purchase will inure to the trust solely if the trustee
fails to show by the clearest proof what portion of the funds belonged
to himself.

2.  *Administration—Diversion of assets—Subrogation of creditors.*

Where the funds of an estate have been diverted to pay an unprobated
debt secured by a first mortgage on realty, a junior mortgagee will be
postponed to the right of creditors with probated claims to be subro-
gated to the lien of the debt discharged.

3.  *Suppression of assets—Surcharging accounts.*

The suppression of assets by an executor or administrator is a sufficient
ground for surcharging his accounts after the close of the administration.

4.  *Approval of accounts—Conclusiveness.*

The approval by the probate court of an account in administration is con-
clusive of the accuracy of every item thereof as against creditors who
appeared and contested such approval, at least until they have shown
that facts constituting fraud have, with no want of diligence on their
part, come to their knowledge since the approval.

5.  *Subrogation—Discharge of mortgage.*

Where a mortgage is paid by one having an interest subject to the mort-
gage, but who is under no obligation to discharge it, as by the widow
of the mortgagor, she will be subrogated to the mortgage lien, without
proof of a specific intent at the time of payment to keep the mortgage
alive.

6.  *Married woman—Husband's conveyance—Estoppel.*

A married woman who joins her husband in a mortgage of his land is not
bound by any covenant therein, nor estopped by the statute (Mansf.
Dig., sec. 642) to acquire subsequently a lien prior thereto.

7.  *Corporation—Transfer of franchise—Assets previously distributed.*

The transfer of the stock, rights and franchise of a corporation will not
carry assets previously distributed among its stockholders.

Vol. LIII—35

8. *Deed to trustee—Defeasance clause—Mortgage.*

A deed to a trustee to secure an indebtedness, and to be void upon payment of the debt, and containing a power of sale upon default, is in legal effect a mortgage.

9. *Mortgage foreclosure—Attorney's fee.*

In mortgage foreclosures, in the absence of a contract, no costs can be taxed against the land or the mortgagor, save such as are ordinarily taxed between plaintiff and defendant.

10. *Betterment act—Bona fide occupant—Rents.*

One is not a *bona fide* occupant of land, within the meaning of the betterment act (Mansf. Dig., secs. 2644 *et seq.*), who acquired possession by purchase at a void judicial sale with actual notice of the pendency of proceedings to annul it; and, upon termination of the litigation, he will be liable for rents accrued during the entire period of his possession.

11. *Receivership—Allowance to tenant of repairs and improvements.*

The purchaser of land at a void judicial sale, who acquired and retained possession with the acquiescence of the receiver legally appointed by the court to rent the land, may be allowed to offset against the rents due by him whatever credits the court would have allowed the receiver if he had cultivated the lands under its directions, including taxes, necessary repairs and such permanent improvements as a prudent man would have deemed necessary to sustain the estate.

12. *Junior mortgagee in possession—Appropriation of rents.*

Where a junior mortgagee acquires the possession of the mortgaged premises by purchase at a void judicial sale during the pendency of proceedings to enforce both liens, the rents by him collected will not be appropriated to the payment of his debt until the senior mortgage is discharged.

13. *Priority of mortgages—Appropriation of rents.*

Where, in a suit to foreclose a junior mortgage on realty, a receiver is appointed to collect rents *pendente lite*, it is not necessary that the senior mortgagee, in a petition to establish the priority of his lien, should specifically pray that the rents be appropriated to its discharge; but when the priority of his claim is established, his right is fixed to priority in the distribution of the rents which accrued after his petition was filed.

In 1874 Mrs. Nancy A. Edrington, widow and sole executrix of James H. Edrington, brought suit to cancel a mortgage executed by him at a time, as she alleged, when he was

incapacitated by disease from attending to business. The mortgage conveyed to J. W. Jefferson, as trustee, two plantations, known as the "Fain" and "Whitmore" places, to secure debts due certain creditors therein named, the deed to be void upon payment of the debt and containing a power of sale upon default. The trustee answered, denying that the mortgage was executed at a time when Edrington was incapacitated from attending to business. The creditors secured by the mortgage answered, likewise denying his incapacity, and filed a cross-bill asking that the mortgage be foreclosed and for the appointment of a receiver to collect rents. In accordance with the prayer a receiver was appointed *pendente lite* to lease and collect rents from the two plantations.

At the time of the execution of the Jefferson mortgage, there was a prior incumbrance on each of the plantations. In 1876 the holders of these liens petitioned to intervene, set up their prior claims, and prayed that the Jefferson mortgage be subordinated to their liens which they asked should be foreclosed.

Subsequently the cause was removed to the United States court, upon the petition of the trustee and the secured creditors in the Jefferson mortgage. A decree was subsequently rendered in favor of such secured creditors. Upon appeal to the Supreme Court of the United States, the removal was held improper, and the lower court was directed to remand the cause to the State court. Pending this appeal and pursuant to the decree of the United States court, the two plantations were sold to one McComb and J. W. Jefferson, a person other than the trustee of the same name. The latter purchased McComb's interest, and entered into possession of the two plantations which he has held continuously since that time.

In 1880, Mrs. Edrington resigned her office as executrix, and made her final settlement which was confirmed by the probate court. John B. Driver was appointed administrator

*de bonis non*, with the will annexed, of the J. H. Edrington estate. In January, 1885, after the cause was remanded to the State court, Driver, as administrator, filed a supplemental complaint, asking to intervene in the cause and alleging that Jefferson, not the trustee, owed the otherwise insolvent estate of J. H. Edrington for rents, including the sum of $6,000.00 by him unlawfully removed from the registry of the United States court, the sum of $48,000.00, which amount he asked the court to require him to pay to petitioner to be applied to the payment of the probated debts of the estate. The probated debts of the estate, the administrator alleged, amounted to the sum of $48,500.00, excluding the probated claims which were secured by the Jefferson mortgage.

On January 17, 1885, Mrs. Edrington filed a cross-complaint, in which she set up the purchase by her with her own means of the two prior incumbrances on the Whitmore and Fain places, and asked that she be subrogated to the rights of the original holders thereof; she alleged that J. W. Jefferson, not the trustee, who now owned the debts secured by the Jefferson mortgage, had collected in rents the sum of $42,000.00, and had unlawfully withdrawn from the registry of the United States court the sum of $6,000.00, sums sufficient to pay off the debts secured by the Jefferson mortgage. She asked that she be subrogated to the rights of the original holders of the first liens.

J. W. Jefferson, not the trustee, answered the cross-complaint of Mrs. Edrington, alleging that he bought the two places in good faith under decree of the federal court; that he had entered into possession thereof, paid taxes, and made valuable improvements and repairs thereon; if his title should be found invalid, he asked judgment against the land for such improvements and repairs, for taxes paid, and that he be required to pay only three years' rents, as provided by the betterment act of March 8, 1883. He denied that he owed the estate of J. H. Edrington the

sum of $42,000.00 for rents, or that he had obtained $6,000.00 from the registry of the federal court.

Jefferson, the trustee, and Jefferson, not the trustee, also filed an answer in which they alleged that Mrs. Edrington paid off the prior incumbrances with money of her husband's estate, and denied that she had paid them with her own means. They filed a cross-bill which alleged that Mrs. Edrington had taken certain improper credits and had withheld assets in her settlements, as executrix, with the probate court; that the estate was insolvent; and that the two plantations were inadequate to pay off the debts secured by the Jefferson mortgage. They asked that her account be surcharged and falsified.

Mrs. Edrington and the administrator filed an answer to the cross-bill, alleging that Jefferson, not the trustee, had purchased the land under a void decree *pendente lite;* that one of the claims secured by the Jefferson deed of trust was due to the Washington Fire and Marine Insurance Co., a defunct corporation which had no representative authorized to collect its claim.

Mrs. Edrington denied the charges of fraud in her accounts, and alleged that the question was concluded by her settlement with the probate court.

Driver, the administrator, filed a petition showing that he had purchased from the Phœnix Insurance Company, the assignee of the Washington Fire and Marine Insurance Company, the latter company's claim against the Edrington estate, for which he asked that credit be given to the estate.

The court dismissed the original complaint, found that Mrs. Edrington, with her own means, had paid off the prior lien on the Whitmore place, but held that she was estopped, as to the creditors claiming under the Jefferson mortgage, by the mortgage executed by her husband and herself; found that the first lien on the Fain place was paid out of funds of the J. H. Edrington estate; held that the claim of the Wash-

ington Insurance Company was a valid claim, and that it had not been assigned to the Phœnix Insurance Co.; charged J. W. Jefferson, not the trustee, with the rents, and credited him with the taxes and necessary repairs; decreed that the Jefferson mortgage be foreclosed, and that Mrs. Edrington hold the Whitmore plantation for the lien paid off by her, subject to the Jefferson mortgage.

The cause was referred to a master to state an account. Pending this reference, Mrs. Edrington died; and the cause was revived in the name of W. B. Edrington as her executor, November 12, 1887. The master's report was filed and confirmed. All the parties have appealed to this court.

*Myers & Sneed, John J. & E. C. Hornor* and *Compton & Compton* for appellant Jefferson.

1. Jefferson, the trustee, is entitled to foreclose the lien of the trust deed for the sum of $28,754.21, with interest from March 16, 1874, at 8 per cent.

2. Jefferson, the trustee, is entitled to an allowance of a reasonable attorney's fee in the endeavor to execute the trust. 2 Dan., Chy. Pl. and Pr. (3d ed.), pp. 1466-1468; 93 Am. Dec., 393 and notes; 36 N. J. Eq., 287; 3 Wait's Ac. and Def., p. 149; 4 A. & E. R. R. Cas., 215.

This is the rule whether the beneficiaries are parties or not. 93 U. S., 352; 111 U. S., 684; 105 U. S., 527. "A trust estate must bear the expenses of its administration." See 4 Beav., 297; 4 Allen (Mass.), 474; 10 Wall., 493; 2 Perry, Trusts (2d ed.), secs. 894, 910, 912.

3. Jefferson, not the trustee, is entitled to the benefit of the betterment act of this State. He was in no sense a mortgagee in possession, but he entered in good faith, believing himself to be the owner, and he is entitled to credit for all expenditures for improvements made under such belief. Act March 8, 1883, sec. 1 *et seq.* He certainly entered under *color of title.* 11 Pet., 41; 1 Meigs, 207; 3

Wash., R. P., 139 (3d ed.); 35 Ill., 394; 35 Ill., 391;
Wood on Lim., 525; 102 U. S., 461; 5 Cow., 546; 48
Ark., 184; 47 Ark., 528. To constitute color of title, it
is not necessary that the deed be good; the statute was made
to remedy bad titles. However groundless the supposed
title, if the writing purports to convey, it affords color of
title. Wood on Lim., p. 528; 47 Ark., 528; 18 How.,
56; 20 Ark., 542; 34 Ark., 547; 62 Ala., 426; 1 Meigs,
207. A void deed confers color of title. 1 Meigs, 207;
34 Ark., 534.

Having entered under color of title, the only other question is, did he make the improvements believing himself to
be the owner? See 45 Ark., 410, and 47 Ark., 528; 48
Ark., 184, as to this. Even if he was advised of the appeal, it was not notice of such an adverse claim as would deprive him of the benefit of the betterment act, because the
reversal of a suit does not necessarily set aside a judicial sale.
Rorer, Jud. Sales, sec. 138; 4 Dana, 20; 7 B. Mon., 57;
12 B. Mon., 471; 11 Ark., 519; Freem. on Judg., sec.
484; 44 Ill., 374; 18 B. Mon., 230; 1 Wall., 627. He
was not bound to know that the court had no jurisdiction.
See also 19 Bl. C. C., 94; 2 Ala., 256; 4 Humph., 362;
27 Minn., 60.

The act of March 8 is retrospective. 48 Ark., 103; 45
Ark., 410.

All improvements made in good faith should be set off
against rents and profits. 6 Paige, 404; 1 Story, 478; 74
N. C., 603; 39 Md., 281; 16 B. Mon., 421; 2 J. J. Marsh,
516; 29 Mo., 52; 10 Ark., 87; 33 Ark., 490-536; 29
Ark., 47; 13 Lea, 587; 12 Lea, 189. The only question
is, were the improvements made in good faith? Constructive notice is not sufficient to prevent a *bona fide* holding, nor
will *lis pendens* prevent an allowance for improvements made
in good faith. 2 J. J. Marsh, 516; 2 Am. Dec., 721; 2
Dil., 566; 13 Lea, 577-589; 6 Fed. Rep., 342; 44 Ill.,

374. The rule that improvements will be allowed in equity independent of betterment acts is stated in 15 Am. Dec., 347; 13 Lea, 589; 30 Am. Dec., 430; 40 Am. Dec., 653.

4. The statutory rule of partial payments should apply, and interest computed up to a period when the credits discharge the interest. All sums collected or due as rents were partial payments, and should have been credited on the interest due on the trust debt. Courts of equity are bound by the statute. Story, Eq. Jur., sec. 64; 1 Ark., 417. The legislatur has fixed the rule, and the courts should follow it. 7 Wall., 514; 3 Metc. (Ky.), 566; 3 Cow., 86; 4 Tyng's (Mass.), 103; 17 Mass., 417; 1 Pick., 194; 4 Hen. & M., 431; 1 Hayw., 279; 4 Har. & McHen., 94; 2 Nott & McC., 395; Kirby's Rep., 49; Kirby's Rep., 326; 1 Halst., 408; 1 Dal., 124; 7 S. W. Rep., 142; 10 Yerg., 160; 1 Heisk., 576.

5. The prior incumbrances were paid off out of the assets of the estate; if not, the executrix at the time had in her hands more money than sufficient to pay them, for which she has never accounted, and in either event they are extinguished, and Mrs. Edrington is not entitled to subrogation. Reviewing the proof, Mrs. Edrington's settlements with the probate court show both these claims were paid, and she obtained credit for them. This is an estoppel of record against her. Herm., Estop., sec. 15. She is not in a nattitude to ask subrogation. She was not compelled to pay these debts to protect her rights, or save her own property. Sheldon on Sub., sec. 3; 66 N. Y., 363; 42 N. Y., 89; 56 Pa. St., 76. Her payment was entirely voluntary; being under no obligation to pay. She was a stranger. 1 Jones on Mortg., sec. 874; 3 Paige, Chy., 117; 23 Am. Dec., 773; 25 Ark., 129; Bisp., Eq., secs. 27, 335.

See also 3 Pom., Eq., sec. 1213; Schouler on Exrs., sec. 443; 76 Am. Dec., 320. She was a trustee, and all her dealings will be taken most strongly against her. 47

Ark., 539; Perry on Trusts, secs. 428, 835. To relieve one from payment of money through mistake, it must be paid to protect an estate. 39 Ark., 539; 6 Gray, 559. The mistake in this case was only as to the solvency of the estate. While, perhaps, entitled to subrogation as against *the heir*, she certainly is not as against creditors. Sheldon on Sub., sec. 202; 8 B. Mon., 419.

The record shows that Mrs. E. had assets which she failed to account for, more than sufficient to pay off these liens, and hence she is not entitled to subrogation. She joined in the deed and the covenants of warranty, and it passed not only any estate then vested in her, but any estate legal or equitable afterwards acquired by her. Mansf. Dig., sec. 642; 47 Ark., 111; 14 Cal., 612; 76 Am. Dec., 449; 48 Cal., 572; 79 Am. Dec., 187. She is estopped from setting up after acquired title. 8 Ohio, 225; 31 Am. Dec., 442; 10 Metc. (Mass.), 291; 7 Mass., 14; 7 Mass., 291; 56 Ind., 19; 4 Bibb, 436; 1 Jones on Mortg., sec. 679; 5 Ark., 693; 33 Ark., 251.

6. The claim of the Washington Fire Ins. Co. never passed to the Phœnix. See Morawitz, Corp., sec. 163; Morawitz, Corp., secs. 181, 177; 71 N. Y., 593; 45 N. Y., 822; 56 N. Y., 553; 76 N. Y., 202. Its assets were all distributed before the transfer.

*U. M. & G. B. Rose* and *E. F. Adams* for appellees, Edrington *et al.*

1. The first liens were paid off by Mrs. E. with her own money; they are still valid, and are held in equity for reimbursement. She had these claims assigned to her and held them until her death. She is entitled to be subrogated. 23 Ark., 166; Sheldon on Sub., sec. 202; 3 Wil. on Exrs. (6th Am. ed.), p. 1973; 2 Woerner, Am. Law of Adm., p. 1039. On payment of the debts she became subrogated to the liens by which they were secured. 1 Jones, Mortg., sec.

874; 29 Ark., 47; 39 Ark., 531; 40 Ark., 132; 3 J. C. R., 312; 7 J. J. Marsh., 503; 3 Mon., 284; 2 Leigh, 70; 12 Gratt., 636; 12 R. I., 510; 42 Ark., 504; 16 Mass., 227.

2. Jefferson, not the trustee, is accountable for rents during the time he had possession. The United States court never had any jurisdiction. 111 U. S., 770. Its decree was void. 29 Ark., 201. A void decree is no decree. Freeman on Ex., sec. 117. Jefferson is chargeable with the $6,000.00 received under the void decree and rents, and should be compelled to pay these sums into court. 9 Wall., 607; 2 Jones on Mortg., sec. 1114; 36 Ark., 17. All his acts were done *pendente lite*, and he is bound by any orders or decrees that may be made herein. 93 U. S., 163; 11 Ark., 411. He was simply a tenant at will, holding under the receiver. 2 Jones, Mortg., sec. 1536; 8 Paige, 565; 8 Paige, 388.

3. Jefferson, not the trustee, cannot set off any improvements as against rents and money received. One acquiring possession of lands legally in the hands of a receiver could not, without an order of court authorizing him to improve, charge up his improvements against the rents. Even a mortgagee in possession is only entitled to those necessarily incurred to preserve the property. 2 Jones on Mortg., sec. 1127; 1 J. C. R., 385; 17 N. Y., 80; 18 Ark., 34.

The betterment act was passed for the protection of *bona fide* possessors, and not mere trespassers; and he is conclusively presumed to know the law. 47 Ark., 359. The claim preferred by Jefferson would be untenable even in the case of an ordinary reversal for error. Freeman on Ex., sec. 481; 29 Ark., 95; 29 Ark., 336. See also Wiltsie, Mortg. Forec., sec. 40; 2 Jones on Mortg., sec. 1127.

The betterment act has not changed the rule. 46 Ark., 336. Jefferson was not a *bona fide* holder. 45 Ark., 419; 50 Ark., 455; Mansf. Dig., 2644.

4. The claim of the Washington Ins. Co. cannot be

allowed; for that institution has long since passed out of ex-
istence. All suits brought by it must abate. 2 Morawitz
on Corp., sec. 1031; 21 Wall., 615; 86 N. C., 492; 68.
Ill., 350; 31 Me., 57; 123 Mass., 32; 18 Iowa, 473; 9.
Lea, 697. When the stock was assigned, the assignors no-
longer had any interest. 1 Morawitz, Corp., sec. 159.

5. Mrs. E. is not estopped by the recitals in her hus-
band's deed, in which she joined to relinquish dower. 1
Bish., Mar. Wom., sec. 603; 33 Ark., 640; 39 Ark., 361;
44 Ark., 161.

6. The defendants cannot go behind the settlements of
Mrs. E. for the purpose of charging her with money derived
from the crop of 1874. No appeal was ever taken from
the judgment litigating this matter, and it is final. 2 Woer-
ner, Adm., sec. 508; 31 Ark., 176. Besides it is too late
now. 42 Ark., 493. Laches in making objections precludes
all inquiry. 95 U. S., 160; 10 Pet., 248.

7. As to the claim for attorney's fees, see 1 Jones on
Mortg., sec. 359; 2 Jones on Mortg., sec. 1606; 105 U. S.,
531; 15 Ark., 100; 27 Ark., 310.

8. Jefferson had no claim for *betterments*. 17 Ark.,
359; 18 Ark., 52; Sedg. & W., Trial of Tit. to Land, secs.
694-5. 48 Ark., 183, has no application. Jefferson had
*actual* notice.

COCKRILL, C. J. Mrs. Edrington was the widow of J.
H. Edrington and sole executrix of his estate. At the time
of her husband's death he was the owner of two plantations.
in Mississippi county, Arkansas, one of which was known as
the Fain place and the other as the Whitmore place. He
executed a deed of trust upon these plantations in 1874 to
J. W. Jefferson, as trustee, to secure the payment of his four-
teen notes payable to the trustee, amounting in the aggre-
gate to $28,754.21, which were for the benefit of creditors
whose names were not set out in a schedule. When this deed

was executed, Edrington owed $10,000.00 on the Fain place for unpaid purchase money, and $8,000.00 on the Whitmore place on a mortgage executed by him in which his wife joined to relinquish dower. These liens were superior to the incumbrance created by the Jefferson deed of trust. After letters testamentary were granted to Mrs. Edrington, she paid off the first lien on each of the places, leaving the Jefferson deed of trust wholly unpaid. The debts secured by the prior liens were never probated against the estate; the creditors whose claims were secured by the Jefferson deed of trust caused their debts to be probated. The estate proved to be hopelessly insolvent. The question of first importance to the parties to this protracted litigation is, whether the liens prior to the Jefferson deed of trust have been discharged by the payment made by Mrs. Edrington, thereby letting in the second lien to be first paid; or, if that is not the state of the case, whether Mrs. Edrington's representative or the administrator of her husband's estate shall have the benefit of the first liens by subrogation.

Mrs. Edrington alleged in the cross-complaint whereby she sought to foreclose the first liens, that she had paid off the claims secured by them out of her own individual means; and the administrator of her estate, in whose name the cause has been revived since her death, contends that she became subrogated to the rights of the prior incumbrances, and that he, as her representative, should be first paid. The determination of this contention involves first an examination of the facts as to whether Mrs. Edrington used her own money or that of the estate in paying off the incumbrances.

*As to the lien on the Fain place:* It was represented by the two notes of J. H. Edrington for $5,000.00 each. Mrs. Edrington paid them off through her commission merchants with whom she had deposited large sums of money raised by the sale of a crop of cotton gathered from the lands of her deceased husband. She had no

funds in their hands derived from any other source, ex-
cept the sum of $5,034.25 of her individual means. That
amount, like all the other credits, was placed to her account as
executrix by the commission merchants, and statements show-
ing that the accounts were so kept were regularly rendered
to her. The merchants advanced $5,000.00 to pay off the
first note, and charged it to her account as executrix; a few
weeks later they advanced the further sum of $5,000.00,
with interest from the date of the negotiation, for the dis-
charge of the second note, and charged the amount as before to
the executrix. The account was paid out of the assets be-
fore mentioned. *Prima facie*, this shows payment from the
funds of the estate. To avoid that conclusion, Mrs. Ed-
rington's representative attempts to show that the sum of
$5,034.05 of her individual means before referred to was
appropriated to the payment of the first note; that she was
entitled to one-third of the funds of the estate absolutely as
dower in personalty, and that out of that fund she discharged
the second note.

The advances made by the merchants to discharge the
notes were charged to the executrix on the 4th of January
and the 3d of February, 1875, respectively. The credit of
$5,034.05 of her individual means was made on the 16th of
January of the same year. No instructions were ever given
to the merchants to appropriate it to any particular purpose.
It was paid to them through a draft payable to the widow
by an insurance company, and was given in settlement of a
policy on her husband's life. The draft was delivered to the
merchants a day or two before the credit was entered on their
books; on the day before it was entered, the merchants
paid a draft drawn on them by Mrs. Edrington for about
$5,000.00 to discharge a lien upon property which she claimed
as her separate estate; and, in a suit between her and credi-
tors of her husband in regard to it, she filed an answer in the
following June, while the transaction was yet fresh in her

. memory, alleging that the amount had been paid out of her individual means. If the payment was not made out of the fund raised by the draft for $5,034.05, it is not clear how it could have been made out of her individual means at all; and, as there is no other explanation of the payment, we must regard Mrs. Edrington's conduct in that suit as an election to appropriate that amount of the sum of $5,034.05 to the payment of that debt. She could not afterwards make a second appropriation of the same fund to the payment of another debt; and we must conclude that the draft for $5,034.05 did not go into the purchase of the notes.

The only pretense of payment of any other sum out of her individual means was that she was entitled to dower out of the estate in the hands of her merchants. But it does not appear that dower had then been set apart to her by the court, and she had no authority to appropriate the money of the estate to her own use until that was done. All the cotton of the estate had not been converted into cash at that time, and the full value of her dower interest in all the personalty did not amount to $10,000.00—the price paid for the notes.

1. Confusion of trust funds.    But conceding for the sake of argument that one-third of the funds of the estate in the hands of her merchants was subject to the disposal of the widow as her dower, she is then in the attitude of a trustee who has mingled individual funds with those of the trust, and she can derive no benefit from the confusion. In the absence of the clearest proof as to what part of her own means went into the purchase, she could take no benefit from it—it would inure solely to the estate. *Atkinson v. Ward*, 47 Ark., 533. But the proof is by no means clear that Mrs. Edrington drew no more on her individual account from the hands of her merchants than the value of her dower interest and the amount of the draft before mentioned. She purchased supplies for her family use, and for the use of the plantations which the probate court authorized her to cause to be cultivated for the estate, and bought

goods to prosecute a business carried on by her and one whom she employed to manage the plantations, all of which were charged to her account as executrix. No attempt has been made to separate her individual purchases from those made for the estate. She has, therefore, so obscured the transactions as to render it impossible for the court to see her equities in the purchase of these notes, if she had any.

It does not follow, however, as the learned counsel for Jefferson have argued, that his deed of trust shall be let in to be first paid out of the Fain place. As we have before seen, the debts secured by the first lien on that place were never probated against the estate of J. H. Edrington, and the estate is insolvent. Payment by the executrix out of the assets of the estate was therefore not authorized by law. It was her duty to hold the moneyed assets subject to be distributed among the probated claims upon the order of the probate court. Payment without order of court upon an unprobated debt was waste of the assets for which suit might have been maintained against the executrix by the creditors whose claims were probated and unpaid, or, as the law now prescribes, by the administrator *de bonis non* for their benefit. But they were not confined to that remedy. General creditors of an estate whose fund has been taken to pay an unprobated mortgage debt are subrogated to the lien of the debt which the fund discharged. The doctrine has been applied by this court where an administrator used the personal assets of the estate is paying probated claims without assigning dower to the widow. It was held under those circumstances that the widow was subrogated to the rights of the creditors whose debts had been discharged, and that she could resort to the realty, as the creditors might have done, for the payment of her dower interest which should have been assigned out of the personalty in kind. *Crouch v. Edwards*, 52 Ark., 499; *Wells v. Fletcher*, 17 Ark., 581.

The administrator is trustee for the widow and creditors

*2. Subrogation of creditors to lien discharged with diverted assets of the estate.*

alike to the extent of their respective interests (*Crowley v. Mellon*, 52 Ark., 1); and, where he wrongfully diverts the fund of either from its proper channel, to permit the injured party to lay claim to the rights of those whom the fund has relieved or to the new species of property into which it has been converted, is but an application of the doctrine that equity will follow the trust fund into whatever form it assumes, so long as it can be traced and no superior equity in another intervenes. *Appeal of Miskimins*, 114 Pa. St., 530; *Atkinson v. Ward*, 47 Ark., 533; *Humphreys v. Butler*, 51 Ark., 351.

Now the Jefferson lien creditors have no equities superior to those of the general creditors of the estate whose funds have been traced into the first mortgage on the Fain place. To subrogate the latter to the rights of the first lien leaves the second lien only in the condition it was when it was taken. The position of the creditors under the Jefferson deed has not been altered by the conduct of the executrix, and they have no equity to assert against the subrogation.

3. The suppression of assets is ground for surcharging executor's accounts.

But Mrs. Edrington's representative claims that her settlements which were approved by the probate court show that she has fully accounted for all the assets of the estate, and it may be argued from this that he is entitled in her right to collect this claim. It is not necessary to consider whether proof of full settlement of her accounts as executrix would clothe her in the garb of the lien holder whose debt she had discharged with money of the estate; for the record shows that she has not accounted for all the assets which came to her hands as executrix. The judgments approving her accounts in the probate court carry the conclusiveness of other judgments of superior courts; but they are open to attack in equity for fraud; and the suppression of assets by an executor or administrator has long been held by this court a sufficient ground for surcharging his accounts after the close of the administration.

In the case of Mrs. Edrington's settlements certain *4. Conclusiveness of the approval of accounts in administration.* creditors holding probated claims appeared in the probate court, filed exceptions to her first and second accounts, and litigated their correctness in that tribunal as well as in the circuit court on appeal from one of the judgments. Among the contesting creditors were some of the largest beneficiaries under the Jefferson deed of trust. These same creditors filed an answer and cross-complaint in this cause, charging that the executrix had practiced gross frauds upon the estate, and prayed that her accounts be surcharged, not for the purpose of recovery against her, but in order that it might be made to appear that she could in no event claim subrogation until she had rendered a perfect account of the trust funds which they, as general creditors of the estate, were entitled to have credited in part upon their claims. The administrator *de bonis non* of the estate of J. H. Edrington also sought to show that the general creditors were entitled to the first liens. A mass of testimony was taken to prove the charges of fraud against the executrix, most of which relates to the items covered by the first and second settlements. But the creditors are precluded by the judgments in the litigations in the probate and circuit courts to which they were parties from again contesting the conclusions reached by the courts in the approval of those settlements. The probate court had jurisdiction to determine the charges of fraud in the administration of the estate. The court of equity is now asked to do no more. But, the creditors having once availed themselves of the opportunity to litigate the question in the probate court, the judgments of that court must be taken as recording that the accounts which they approve speak the incontestable truth as to all they contain both of debits and credits, until the creditors have shown at least that the facts constituting the frauds now complained of have come to their knowledge since those litigations and with no want of diligence on their part. There is no pretense of such a state

of case; and the items of the previously litigated accounts must be taken as correct. But that alone is not sufficient to protect Mrs. Edrington. It was alleged in the cross-complaint against her and proved that she had suppressed assets which were never mentioned in her accounts and were not drawn into the litigations in the probate court. We are unable to say that the testimony makes it certain that the amount of the deficit reaches $10,000.00, the sum paid for the notes. The value of some assets which came to the hands of the executrix, for which she rendered no account, is definitely proved. These amount to over $3,000.00. In other instances the suppression of assets is proved, but the damage to the estate is left uncertain or undetermined. The total deficit may have reached $10,000.00. After the deficit was proved by her adversaries and the amount left uncertain, it devolved upon Mrs. Edrington to show that it did not reach $10,000.00 if she desired to be heard to assert a right to the difference between that sum and the actual deficit. The confusion of a trustee's accounts is never permitted to prejudice the rights of a beneficiary, and, as long as there is a doubt, it is resolved against the trustee. *Atkinson v. Ward*, 47 Ark., 533. Mrs. Edrington cannot, therefore, take any part of the proceeds of the notes.

We conclude that the administrator of J. H. Edrington's estate is entitled to foreclose the first mortgage on the Fain place for the benefit of the general creditors of that estate.

5. Widow discharging mortgage on estate entitled to subrogation.

*As to the first mortgage on the Whitmore place:* It seems to be conceded that Mrs. Edrington paid off this incumbrance with her individual means. It amounted to $8,000.00 of which $7,000.00 was paid through a bank in Memphis out of money derived from insurance on her husband's life; she executed her promissory note for the other thousand, and afterwards paid it—how is not shown, but the presumption, in the absence of a showing to the contrary, is that it was paid out of her individual means. She appears

to have paid the incumbrance under the belief that the estate was solvent; that its assets would discharge the other debts; and that thereby the lands would be saved for her children who were the heirs of J. H. Edrington. The beneficiaries under the Jefferson deed of trust argue that she was a mere volunteer in making the payment, and that it inures to their benefit. But, at the time of making the payment, her dower in the realty had not been assigned; she had joined her husband in the mortgage and released her right to dower in favor of the mortgagee, and the deed stood as an obstacle in the way of its assignment. Her right to dower, subject to this incumbrance and the one to Jefferson as trustee, remained however. Now it is an established rule that when a mortgage is paid by one having an interest subject to the mortgage who is under no obligation to discharge it, he will be subrogated to the mortgage lien. In such case proof of a specific intent at the time of payment to keep the mortgage alive is not required. The payment will be referred to the estate which it is the interest of the party making it to protect, and thus go to strengthen his title or right. 1 Jones, Mortg., sec. 877; Boone, Mortg., sec. 136; *Walker v. King*, 44 Vt., 601; *Gatewood v. Gatewood*, 75 Va., 407. Accordingly a widow who is entitled to dower in the equity of redemption is subrogated to the right of the mortgagee on paying off the mortgage debt. Sheldon on Subrogation, sec. 51; 2 Jones, Mortg., sec. 1067; *Gatewood v. Gatewood*, 75 Va., *supra*.

Mrs. Edrington was not, therefore, a volunteer. Her equity is not affected by the fact that there was a second mortgage on the land in which she had joined to relinquish dower. She supposed that would be discharged by the estate of her husband, and so leave the land free. The second mortgagees are in no worse attitude than if she had not redeemed the land from the first mortgage.

But Mrs. Edrington joined with her husband as a grantor

6. Married woman not estopped by joinder in husband's deed to subsequently acquire title. in the Jefferson deed of trust, and not only purported to convey the fee, upon condition that the land should be reconveyed to her husband upon the payment of his debts secured thereby, but joined also in a covenant that there was no prior incumbrance on the land; and relinquished dower. It is argued that the covenants in the deed, express and implied, estop her from setting up the prior mortgage.

If she had been *sui juris* when the mortgage was executed, the position would be tenable. If the land had been her separate estate, the authorities cited by counsel opposed to her interest would be in point as sustaining the same rule. But she was under the disability of coverture when the deed was executed, and had no interest in the land save the inchoate right of dower. The mortgagees under the Jefferson deed were apprised of these facts, and had actual knowledge, as well as constructive notice, of the prior incumbrance when their deed was executed. They have not therefore been misled or deceived; and if that consideration could influence the determination of the question of estoppel when the disability of coverture, unrelieved by statute, is the defense, this case would be freed of it. The case stands then upon the covenants of a married woman in relation to her husband's land. In that respect her common law disability remains, except in this: she is authorized to relinquish her right of dower by a conveyance executed in accordance with the statute. She incurs no personal liability for a breach of such covenants, and they do not work an estoppel against her. *Benton County v. Rutherford*, 33 Ark., 640; *Wood v. Terry*, 30 Ark., 385; *Bagley v. Fletcher*, 44 Ark., 161; *Bank of America v. Banks*, 101 U. S., 240. As was said by Judge Dillon in *Childs v. McChesney*, 20 Iowa, 431: "While many authorities hold that a wife who conveys *her own* land with covenants of warranty will be estopped to set up a subsequent title, yet few, if any, of them hold that she is thus estopped where she unites in a convey-

ance of her husband's real estate, though she joins in a cove-
nant." S. C., 89 Am. Dec., 545 and authorities cited;
*Griffin v. Sheffield*, 38 Miss., 392; *Edwards v. Davenport*,
20 Fed. Rep., 756.

Under our statute an after-acquired interest in land inures
to the benefit of the grantee who holds by a deed without
covenants of warranty, and the statute is applicable to con-
veyances by way of mortgage. *Kline v. Ragland*, 47 Ark.,
111. The effect of the statute is to import into the body
of the conveyances, as though written there, a provision to
the effect that the grantor conveys all the estate he possesses
at the time of conveyance, or which he may thereafter ac-
quire. *Clark v. Baker*, 14 Cal., 630. But as the wife is
only authorized to relinquish dower in her husband's land,
the latter provision as to the after-acquired interest in his
land would be void as to her. *Felkner v. Tighe*, 39 Ark.,
361. And as the express and implied covenants made by
her with her husband in a conveyance of his land are nulli-
ties, the deed is no more than a release of her present inter-
est in the land (*Bagley v. Fletcher*, 44 Ark., 161; *Wit-
ter v. Biscoe*, 13 Ark., 422), and would not for that reason
carry an after-acquired interest. The statute has therefore
no application to the case, and the deed does not operate to
bar the right to enforce the mortgage.

But it is argued with much zeal that a court of equity
should decline to aid Mrs. Edrington for the reason that she
did not render a faithful account as executrix to the probate
court in the administration of the estate of her deceased hus-
band. But, as we have before pointed out, we cannot look
behind the items contained in the accounts which were con-
firmed, after exceptions to them were passed upon, to find
the evidence of the frauds complained of. There must be
an end to litigation, and the prior judgments upon the issues
then as now involved are conclusive of the facts required to
establish their truth. Confining our inquiry to the investiga-

tion of supposed frauds which were not involved in the settlement of the accounts about which the previous litigations were had, we are unable to fix the value of assets unaccounted for by the administratrix at more than $10,000.00. But that amount has been restored to the estate with accrued interest in the form of the first mortgage on the Fain place. The beneficiaries under the Jefferson trust deed who have probated their claims against the estate are then in position to receive all that they were entitled to out of the diverted assets of the estate. The funds have been restored, and the fact of their once wrongful diversion alone remains. The wrong has thus been divested of its injury. The beneficiaries under the Jefferson trust deed as such had no interest in the assets of the estate of J. H. Edrington. Their interest in the general assets of the estate arose only by reason of the probate of their claims. When the interest thus acquired in those assets is fully satisfied, they have no legal cause of complaint against the administratrix.

The right of subrogation which she invokes does not come through a breach of trust or other wrong committed by her, nor will any scheme of fraud be aided, or any injustice done to the second mortgagees, by permitting the doctrine to have operation. It is only in such cases that equity refuses its aid to those who show themselves otherwise entitled to it.

The representative of Mrs. Edrington is, therefore, entitled to the benefit of the first lien on the Whitmore place.

7. Transfer of corporate franchise will not carry assets previously distributed among stockholders.

*As to the Jefferson deed of trust:* The claim known as that of the Washington Fire and Marine Insurance Company, amounting to some $10,000.00 and interest, is the only part of this incumbrance that is contested. It is conceded that Edrington owed the debt; that it is unpaid; and that the conveyance was made to the trustee to secure its payment with the others. The contention on the part of the heirs and administrator of J. H. Edrington's estate is that the insurance company, which was a corporation duly

organized under the laws of Tennessee when the deed was executed, has become defunct, and that no one is authorized to collect the debt. But the existence or non-existence of the corporation is not material to the issue as we view it. The debts due the creditors for whose benefit the deed was made to the trustee amounted to considerably more than $28,754.00—the amount of the security given. If therefore there is no one authorized to receive the claim in question, the benefit would inure, not to Edrington or his estate, but to the other secured creditors who would receive a larger *pro rata* on their debts. As long as there were debts due other creditors sufficient to absorb the security, Edrington would be required to pay. But that is not all. After the execution of the trust deed, and while, as is conceded, the corporation was still *in esse* and free from debts, there was a distribution of the corporeal assets among the then stock-holders. It is shown by a resolution adopted by the board of directors, who acted in pursuance of the unanimous request of the stock-holders, that it was their intention to distribute the proceeds of the claim now in controversy as they did the other assets; and, in pursuance of the action of the board looking to a distribution of all the assets, the president of the company, as he testifies, acting in conjunction with a committee appointed by the board to gather and distribute the assets, took charge of the litigation which was then pending to collect the debt. It could not be disbursed until it was collected. Assuming control of the suit to collect was therefore the most practical reduction to possession for the purpose of disbursement attainable. That was done, as before stated, on behalf of the stock-holders by authority of the board of directors, with the intention of thereby segregating the debt from the assets of the company. It was done with the approval of the intended purchaser (the Phœnix) of the entire stock of the company. A proposition had been made by the Phœnix Insurance Company, and accepted by the Washington, to purchase the rights

and franchises of the Washington. The proposition included none of the corporeal assets. The distribution of the assets of the Washington was made by that company, with the knowledge of the other, to meet that proposition. After the transfer of the stock to the Phœnix, that company acquiesced in the claim of right on the part of the former president of the Washington to continue the control of the suit for the collection of the Edrington debt, on behalf of the old stockholders of that company; and it asserted no claim to the debt until recently instigated to do so by the administrator *de bonis non* of the estate of Edrington. The acquiescence of the purchasing company is confirmatory of the testimony of the former president of the Washington that the Edrington debt had ceased to be the property of the corporation when the stock was transferred. The board of directors of the Washington Insurance Company and its committee intended to bring about that result, and it was the legal effect of their acts. After the committee for the stock-holders assumed control of the claim under the authority conferred by the board of directors, the debt ceased to be the property of the corporation and vested in the individuals then holding the stock in the proportion of their several shares, just as a dividend declared by the board and passed to the credit of the stockholders becomes their individual property. The subsequent sale of the stock did not therefore pass any interest in the Edrington debt. Jefferson, who is the trustee of an express trust, is entitled to collect the entire amount claimed under the deed to him for the benefit of those now owning the debts.

8. A deed of trust, so-called, with a defeasance clause is in effect a mortgage.

*Allowance of attorney's fees as costs:* The trustee under the Jefferson trust deed made application to the court in apt time for an allowance of costs, to be paid not out of the funds of the beneficiaries under the deed but as an additional charge out of the lands, to reimburse him for the expense he had been put to in payment of counsel fees. The

court refused to make the allowance, and we concur in the ruling. It is not contended that the allowance should be made on account of any provision in the deed authorizing it. The contention rests upon the general equitable right of a trustee to be reimbursed all expenses properly incurred in the execution of the trust. But the so-called trustee in this case occupies no better attitude towards the estate of the grantor than a mortgagee with power of sale, for the deed to him is in legal effect only a mortgage. *Turner v. Watkins*, 31 Ark., 429. The suit to foreclose the lien, for which the allowance of counsel fees is asked, is prosecuted by him for the sole benefit of the creditors whose debts are secured by the deed, and such creditors have always the power to join the trustee as plaintiffs and direct and control the litigation for their own benefit, as they have done practically in this case.

But whether the suit is prosecuted by the trustee, or by the trustee and creditors, it is in effect only the creditors seeking the satisfaction of their debts, and they must bear that expense as other litigants do. A different practice, it is said, prevails in the federal courts in suits prosecuted to enforce trust deeds against corporations for the payment of bonds in the hands of numerous holders. But in such cases it will doubtless be found that the defendant corporations were insolvent, and that the fund distributed belonged really to the beneficiaries, thus making application of the general rule that when one jointly interested with others in a common fund, or who has been selected by deed, as Jefferson was, to collect the fund, maintains a necessary litigation to recover it for the benefit of all, he is entitled to reimbursement, as between solicitor and client, out of the common fund. *Trustees v. Greenough*, 105 U. S., 527; *McPaxton v. Dickson*, 15 Ark., 97. But, in the absence of a provision in a mortgage authorizing the collection of fees or costs on foreclosure, the rule is that no costs can be taxed against the land or the mortgagor, save such as are ordinarily taxed between plaintiff

9. Taxing attorney's fees in mortgage foreclosures.

and defendant. 2 Jones, Mortg., sec. 1606; *Bynum v. Frederick*, 81 Ala., 489; *Thomas v. Jones*, 84 Ala., 302; *Adams v. Kehlor Milling Company*, 38 Fed. Rep., 281. In this case the representative of the mortgagor after his death instituted suit against the trustee to prevent the enforcement of the power of sale under the mortgage, and obtained a temporary restraining order. No legal reason was assigned in the bill for the injunction. At an early stage in the litigation the court awarded a fee to the trustee's attorneys for services in dissolving the injunction. It was paid by the receiver. There appears to have been no opposition to the order, and it has not been challenged here. We leave it therefore, as counsel have, unchallenged and without consideration.

10. Who is not a *bona fide* occupant under the betterment act. *As to the account of J. W. Jefferson, not the trustee, under his purchase at the void judicial sale:* While the cause was pending in the State court, a petition for removal to the federal court was presented by the trustee and the beneficiaries in the trust deed. After the cause was docketed in that tribunal, Mrs. Edrington moved to remand it to the State court; the motion was denied; and the cause progressed in October, 1879, to a final decree, which directed that the mortgaged property be sold to satisfy the Jefferson trust deed freed of the prior incumbrances. It is not out of place to say that the decree was not based upon the identical evidence that was adduced at the trial in the State court. From this decree Mrs. Edrington prosecuted an appeal, without supersedeas, to the Supreme Court of the United States, assigning for error the refusal of the court to remand the cause upon her motion. The Supreme Court found that the cause was not removable when the petition for that purpose was filed, vacated the decree, and directed that the cause be remanded to the State court. In the meantime there had been an attempted execution of the decree. One McCombs in connection with J. W. Jefferson—a different individual from the trustee of the same name—became the purchaser,

received a deed from the commissioner appointed to make the sale, and entered into the possession of the property which was then in the hands of a receiver appointed by the State court. Soon thereafter McCombs sold his interest to his co-purchaser who cultivated the lands and made valuable improvements as upon his own property. When the State court resumed jurisdiction of the cause in 1884, Jefferson, the purchaser, was required to deliver possession to the receiver. It is conceded that the decree under which he purchased is void for want of jurisdiction in the court rendering it, and that he acquired no title to the lands by his purchase. His contention is that he has peaceably improved the lands under color of title, believing that he was the owner; and that he is therefore entitled to pay for his improvements, and not accountable for rents except for the period fixed by the betterment act—that is, for three years prior to the order making him a party to the suit. Mansf. Dig., secs. 2644-7.

The established rule is that such a claim can be successfully asserted only by one who is a *bona fide* occupant, and to constitute such occupancy the statute requires that the possession should be peaceable. But possession which is contested by litigation is not peaceable. Suit for the possession is the highest evidence of hostility to the possessor's right. *Fee v. Cowdry*, 45 Ark., 419; *Beard v. Dansby*, 48 Ark., 187. Litigation adverse to Jefferson's title was pending during the whole period of his possession. It is argued that he had no actual knowledge that his title was contested. The chancellor found otherwise, and the testimony sustains the finding. Although not a party to the record, he had been a party in interest from the inception of the litigation, and was actively concerned in the management prior to his purchase at the supposed judicial sale. From time to time pending the suit and prior to the decree in the United States court, he had purchased at a heavy discount from parties to the record a large majority in value of the debts secured by

the Jefferson trust deed, and, before any improvements were made upon the land, he had become practically the sole beneficiary under that instrument. The attorneys employed by Jefferson, the trustee, received their fee and retired from the litigation several years before the decree in the United States court, and the counsel previously employed by Jefferson, not the trustee, on behalf of the interest known as the Washington Insurance Co. claim, assumed control of his entire interest in the litigation. Before any improvements were made, Jefferson, not the trustee, took a conveyance of the interest acquired by McCombs at the supposed judicial sale, which recites that the appeal, which was afterwards prosecuted to a successful termination, had been prayed by the parties adverse to his interest; and it was expressly stipulated that Jefferson took McCombs' interest subject to all the hazards of the appeal; and, as assurance against loss by the appeal, Jefferson took from McCombs an assignment of the secured claim controlled by him. There is nothing in the record to indicate that Jefferson ever entertained the belief that the appeal would be abandoned, or that there was any reason for such belief. His reliance was placed upon the advice of counsel to the effect that the appeal could not affect his title. But his adversaries continued to press the appeal, and the advice of counsel, upon whatever ground it was based, could not shield him against any of the consequences of the judgment rendered thereafter. Sedg. & Wait, Trial of Title to Land, sec. 695. There is no question of constructive notice of the facts material to his interest in the case, as Jefferson's counsel argue. He had actual knowledge of the prayer for and of the perfected appeal, the object of which was to oust him under a superior right. He knew therefore that his title was contested; his possession was not peaceable and he was not a *bona fide* occupant within the meaning of the statute.

But he was not a willful tort-feasor. There is no doubt

that he honestly relied upon the advice of his counsel, and that goes far toward establishing good faith. *Searl v. School District*, 133 U. S., 553. The receiver, who was never legally discharged, acquiesced in his possession pending the appeal. While his possession was not legally that of the receiver, the latter could have successfully demanded it of him at any time, and is now entitled to receive the rents as though Jefferson had held as his tenant. It is but equitable therefore, in demanding the rents which accrued before the receiver resumed possession, to allow Jefferson to set off against them whatever charges the court would have allowed the receiver if he had cultivated the lands under its direction. That would include taxes, necessary repairs and such permanent improvements as a prudent man would have deemed necessary to sustain the estate. Ordinarily a receiver would not be allowed for improvements without previous authority from the court to make them, but where they are made in an emergency or without fault on his part in not procuring previous authority, and are essential to the profitable enjoyment of the estate and inure to its permanent betterment, the court may allow a reasonable remuneration for them. In *Waldrip v. Tulley*, 48 Ark., 298, we approved a charge in a guardian's account (whose duty in this respect is like that of the receiver) for building and equipping a gin-house on his ward's lands without previous authority from the court. Upon the same principle Jefferson should be allowed to off-set against the rents, the reasonable value of the gin erected by him, provided it was essential to the profitable enjoyment of the lands, and the cost was no more than should have been paid for a building and equipment suitable for the purpose. See *Waggener v. Lyles*, 29 Ark., 47; *Waggener v. McLaughlin*, 33 Ark., 195.

The rents being payable to the receiver, Jefferson's contention about the computation of interest upon the applica-

11. Allowance of repairs and improvements to a tenant of the receiver.

12. Junior mortgagee in possession—Appropriation of rents.

tions of payments to his mortgage debts is without merit, at least as against the prior incumbrances. His legal obligation as to those creditors is to render the rents to the receiver with interest from the time of year they ordinarily became payable by the custom of the country, and if the rent of either plantation discharges the prior lien thereon, then, but not till then, can he assert the right as against them to appropriate rents to the payment of his second mortgage debts.

He is liable also to account to the receiver for the rents which he withdrew from the registry of the United States court. The money was rightfully in the hands of the receiver, and Jefferson wrongfully got possession of it. If it is essential to the interest of the prior lienors that the sum should be repaid by Jefferson to satisfy their demands, it should be repaid with interest for that purpose. But as it was received by him on account of his mortgage, which was due and is still unsatisfied, the parties other than the first lienors cannot complain if it remains as a credit on the interest due on his debt, and it should be so regarded until it is ascertained that it is necessary to resort to it to satisfy the earlier liens. The same is true of the rents due from Jefferson for the period the appeal was pending. As to all persons, save the receiver and those represented by him, it would be equitable to regard Jefferson in the light of a mortgagee in possession, in so far as the appropriation of the rents to the payment of his debts is concerned; and so to credit the gross sums to be charged against him on that score as of the time they became due. But if those sums are required to pay off the prior liens, then, as we have said with reference to the money obtained from the receiver, it must be refunded; and proper orders may be made for that purpose in the cause when the occasion arises.

The receiver has regularly let the premises to Jefferson, not the trustee, from year to year, since the State court resumed jurisdiction of the cause. No rents have been paid

by him, but security has been taken by the court for the payment.    Jefferson should be charged with the amount due on that score with interest.

The cause will be referred to W. P. Campbell, as master, to ascertain and report from the evidence in the record, (1) the value of the use of the plantations separately pending the appeal to the Supreme Court of the United States with interest for each year at the legal rate; (2) the credits to be allowed on this account for repairs, taxes, etc., on the basis before indicated; (3) a statement of the amount withdrawn from the hands of the receiver through the medium of the United States court with legal interest; (4) the amount due upon the Jefferson trust deed after crediting the net amount charged for rent and the amount withdrawn from the hands of the receiver as of the dates when the several credits were payable; (5) state Jefferson's account with the receiver for each plantation, separately as near as may be, for rents due since the State court resumed jurisdiction of the cause.

When the account is stated, Jefferson will be required to pay over forthwith the amount found due under the fifth direction made above, which will be applied toward the extinguishment of the first lien on the plantations, devoting the rent of the Fain place to the extinguishment of the prior lien on that place, and the rent of the Whitmore place to the prior lien thereon.

If the rent shall be insufficient to discharge either of them, the land will be sold to pay the residue and to satisfy the Jefferson trust deed.    What remains from the rents or the sale of the land, after discharging the prior liens, will be applied to the extinguishment of the Jefferson trust deed.    If in any event the prior liens are not paid in full, then Jefferson shall be required to refund the entire amount due by him from both sources, or as much thereof as is required to satisfy the prior liens.

Additional opinion after the Master's report.   Filed  November 29, 1890.

COCKRILL, C. J.   The report of the master has been filed, in accordance with the directions contained in the opinion of the court.   As no exception has been taken to it, it is regarded as correct, and will be confirmed.

It shows that the amount due October 1, 1890, on one of the prior liens is $25,822.22, and $20,600 on the other; that the amount due on the Jefferson trust deed is $65,855.77, which is the second lien on both plantations; and that the amount for which Jefferson, not the trustee, is chargeable after allowing proper credits is $54,969.64.   As it appears that Jefferson, not the trustee, is the sole beneficiary under the Jefferson deed of trust, if we pass to his credit the amount with which he is charged, it will still leave a balance due him of $10,886.13, and the land must be sold to pay the first liens and this amount.   If, instead of crediting the amount in his hands upon the sum due him, he be required to discharge the first liens out of that amount, there will then be due him the sum of $57,308.35, for the payment of which the lands must be sold.   It is evident therefore that a sale of the lands to discharge the liens is inevitable, whether Jefferson be required to pay into court the amount charged to him or not; unless the heirs or administrator of Edrington's estate shall pay off all the liens.   If the lands are of sufficient value to pay off the first liens, there is no hardship in requiring the creditors holding them to await the delay of a sale; while the other course would subject the lands or Jefferson to the expense, to say nothing of the harassment, incident to the payment of a large sum of money into the registry of the court, only to be paid back by an immediate sale of the lands.   It is urged that, as a portion of the amount due the administrator will be paid to Jefferson on his claims probated against the estate of Edrington, and will, to that extent, diminish his charge against the lands, he ought

to be required thus to reduce his demand before the sale of the lands. But we are unwilling to undertake the distribution of the assets of the estate of Edrington. If it be conceded that it appears that the probate court has fully performed its functions, leaving nothing to be done except a distribution of the assets (see *Reinhardt, Admr. v. Gartrell*, 33 Ark., 727), it is apparent that there are tedious details connected with the distribution which the encumbered state of the docket of this court precludes the consideration of. It cannot be said, therefore, that the payment by Jefferson would accomplish what the representatives of the estate desire. If the proceeds of the sale prove insufficient to discharge the first liens, Jefferson must make good the deficit out of the funds in his hands, and the court, by appropriate orders, should require him to do so; otherwise it is not necessary to require of him the payment of any sum.

  Counsel for Jefferson say that rents were raised by the receiver at the instance of the trustee and beneficiaries under the Jefferson deed of trust, before the prior lienors were parties to the suit or laid claim to the rents, and that Jefferson should not be required to surrender such rents for their benefit. Whether the contention is true in point of fact as to the first rents collected is not material to ascertain, for it is apparent from the record and the report of the master that there is no probability that the deficit in the payment of the prior liens, which may exist after exhausting the proceeds of the sale of the lands, will exceed the amount due for rents chargeable to Jefferson after the time the first lienors filed their cross-complaint to foreclose their liens. The object of their cross-complaints was to enforce their rights as superior to those of the Jefferson mortgage, and, as the receiver was the court's officer holding for the benefit of all the litigants, it was not necessary that they should specifically pray that he should be required to hold for them; but when the priority of their liens was established, their right was fixed to pri-

13. Priority of mortgages—Appropriation of rents.

ority in the distribution of the rents accruing at least after the cross-complaints were filed.

Further directions are necessary as to the proceeds of the mortgage to which Mrs. Edrington's administrator has established the right to succeed. The record discloses that, in her third settlement in the probate court, she obtained credit against the estate of her husband for the full amount paid by her on each of the prior mortgages mentioned in the opinion of the court. It has been found that she paid off one of the mortgages from the funds of the estate and the other from her individual means. To take credit for the first was a fraud upon the estate, and all that she is entitled to will be restored if she is subrogated to the right she seeks to enforce here. Her settlements, as we have seen, were drawn in question in this litigation, not for the purpose of surcharging her account, but only to test her right to subrogation. We have found that she was entitled to subrogation, but, as a condition to the enjoyment of the fruits of that right, she, or her representatives for her, must do equity; and they will be required to enter a release upon the record to her husband's administrator of all claim against the estate based upon the payment of the mortgages referred to.

The decree of the circuit court will be reversed, and the cause remanded with instructions to enter a decree establishing the liens upon the lands in the order, and upon the condition, specified in the opinion, and for the amounts found by the master; and, if the same are not paid, to cause the lands to be sold to satisfy them; if there is a deficit in the payment of the prior liens, to cause Jefferson, not the trustee, to make it good out of the funds in his hands; if it should appear to the court that the Edrington estate is ripe for distribution, and that justice will be subserved by a distribution in equity, to proceed to distribute the fund going to Edrington's administrator; otherwise, to remit the distribution to the probate court; and to take such other steps consistent

with the opinion and direction of this court as may seem
proper.

Jefferson will pay the costs of the appeal and cross-ap-
peal, except such as are incident to the reference to the mas-
ter, which will be adjudged against the administrator of Ed-
rington's estate, and paid out of the fund to be recovered by
him.